UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:

LORENZO ESTEVA,
Debtor.
_______________________________________/

LORENZO ESTEVA, a Florida resident, DENISE OTERO VILARINO, a Florida resident,

Plaintiffs,

vs.

UBS FINANCIAL SERVICES, INC., a foreign corporation and UBS CREDIT CORP., a foreign corporation,

Defendants.
_______________________________________/

CASE NO. 18-16645-BKC-LMI

Chapter 11

ADV. CASE NO. 19-01047-LMI

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Lorenzo Esteva and Denise Otero (collectively the ***Estevas***) file their Opposition to UBS' Motion for Partial Summary Judgment (DE 177) and Cross-Motion for Summary Judgment and in support state:

## PRELIMINARY STATEMENT

In November 2015, UBS hired Lorenzo Esteva, a financial advisor licensed by the Financial Industry Regulatory Authority (FINRA), the self-regulatory organization overseeing broker-dealers in the U.S. securities industry. UBS instructed Lorenzo to close

his joint Merrill Lynch account and open a joint UBS account to trade the Estevas' investments (the joint UBS account).

Each prospective client must sign the ***UBS Client Relationship Agreement*** (the "***CRA***"). The CRA's terms govern the account relationship between clients and UBS. The CRA provides UBS clients with margin loans to fund leveraged investment opportunities using loan proceeds. The CRA also discloses that UBS may require the margin borrower to execute a promissory note evidencing a margin loan.

UBS constantly recruits financial advisors from competitors, hoping to poach the advisor's book of business from the former employer. Advisors are commission-based earners. When an advisor resigns to join a competitor, the former employer is unhappy about losing the advisor's big book of business, if not the advisor himself. Their displeasure is expressed by shutting down commissions paid to the departing advisor. The real cash-flow hiccup, however, is that onboarding the advisor's book at the new employer may take a year or more. UBS provides recruits with bridge-the-commission-gap loans (the ***BTCG Loans***) to prevent new recruits from becoming income-insolvent. UBS repays the loans with the future commissions earned from the recruit's book of business.

UBS advanced four BTCG Loans to Lorenzo, each evidenced by a promissory note signed by Lorenzo (the "BTCG Notes") and a related transition payment agreement under which Lorenzo committed a sufficient portion of his future commissions to repay the BTCG Loans.

In June 2017, UBS terminated Lorenzo, asserted a security interest in the joint UBS account to secure repayment of the BTCG Notes payable only by Lorenzo, and froze the account. Because UBS had not asked Denise to sign the BTCG Notes or guarantees, UBS

belatedly argued that the CRA granted UBS a security interest in the Joint UBS Account and that Denise, by signing the CRA, knowingly consented to the security interest grant.

Lorenzo and Denise filed an adversary complaint attacking the validity of UBS' lien. Ruling on the competing motions for summary judgment, Judge Isicoff considered UBS's lien theory "***a textbook illustration of a circular argument***." She thought UBS was simply "***trying after the fact to create a lien that did not exist, a gotcha lien, … to recover some of the losses it has incurred***." In her opinion, the CRA "***at best . . . was ambiguous***" . Oral Ruling on Mot. for Summ. J., Adv. ECF No. 28 (June 10, 2020). The Eleventh Circuit agreed with Judge Isicoff that the CRA was indeed ambiguous on whether it afforded adequate notice to Denise that she was granting UBS a security interest in the Joint UBS Account.

Now, after remand, UBS can offer no evidence to support its strained reading of the ambiguous CRA. UBS has not disclosed who within UBS drafted this form, when this particular version was drafted, or how many versions came before or since. The CRA does contain language regarding the payment of promissory notes, but, as mentioned above, those references are in the margin lending section. The CRA does not refer to Lorenzo's Notes, and Lorenzo's Notes do not refer to the CRA. Also, the timeline cuts against the lien theory. Denise and Lorenzo signed the CRA on December 1, 2015, a week before Lorenzo signed the first promissory note on December 8, 2015. How could the generic "promissory note" in the margin section of the CRA have notified Denise that she was pledging the joint account to secure Lorenzo's Notes, which were not yet executed?

Early on, UBS sought and obtained leave to bring counterclaims against the Estevas to recover alleged fraudulent transfers. The "transfers" UBS described were Lorenzo's

deposits of the note-proceed checks, payable to him individually, into the joint UBS House Account. The obvious problem is that a fully-secured creditor cannot assert a fraudulent-transfer claim. Having abandoned its lien claim, UBS is left arguing that putting the notes' proceeds in its own hands somehow put them beyond its reach. UBS's fraudulent-transfer theory fails for at least seven independent reasons.

UBS's fraudulent-transfer counterclaims fail for reasons that reduce to three. First, the theory refutes itself: the same deposits cannot both enhance UBS's collateral and be placed fraudulently beyond its reach, so accepting UBS's own lien premise defeats the claim.

UBS is judicially estopped: for nearly a decade it stood on a fully secured proof of claim ($2,034,662.28 secured, $0.00 unsecured), and a fully secured creditor suffers no injury from the very deposits it now brands fraudulent. Third, equity bars the claim: UBS designed the advance-commission structure, required Lorenzo to open the joint House Account, and directed that the note proceeds be deposited there - it cannot invoke an equitable statute to unwind the transactions it built and initiated. In all events, the deposits depleted nothing - each advance was matched dollar-for-dollar by UBS's offsetting obligation under the transition-payment agreements - Lorenzo was solvent and repaying, and the only UBS-era misconduct UBS ever documented occurred in 2017, months after the 2016 deposits.

At bottom, UBS's two theories cannot coexist. Every fact that supports the lien defeats the fraudulent-transfer claims, and every fact that supports the transfer claims defeats the lien. UBS cannot prevail on both, and it should not be permitted to advance both at once.

**STATEMENT OF FACTS**

The facts material to these cross-motions are set forth in Plaintiffs' Statement of Material Facts ("Pls.' SMF") and Plaintiffs' Response to UBS's Statement of Material Facts ("Resp. to UBS SMF") filed concurrently, to which the Court is respectfully referred. The following summary is provided for the Court's convenience and cross-references those statements.

1. UBS advanced Lorenzo roughly $2 million through four promissory notes; only Lorenzo signed them. Esteva v. UBS Fin. Servs., Inc. (In re Esteva), No. 23-14050, 2025 WL 2171062, at *3 (11th Cir. July 31, 2025). Lorenzo deposited the proceeds into a UBS "House Account" he held jointly with his wife, Denise, as a Florida tenancy by the entireties. Id. at *3, *10. The account is governed by a pre-printed UBS Client Relationship Agreement that both Lorenzo and Denise signed. Id. at *4. The signature card, which Denise signed, recites: "By signing below and depositing cash or securities in my account, I acknowledge that I have read, understand and agree with the enclosed UBS Client Relationship Agreement." (CRA Signature Pages, App. pp. 0028–0030.)

2. Two CRA provisions are at issue. The lien provision states that as "security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between you and any UBS Entity … you hereby grant to each UBS Entity a security interest in and lien on any and all Property held or carried by any UBS Entity for you or on your behalf in or credited to any UBS Account(s)." *Esteva*, 2025 WL 2171062, at *9. The joint-and-several clause states that "the account holders are jointly and severally liable for all obligations with respect to the Account." *Id.* at *9.

3. UBS asserts, by declaratory counterclaim, that it holds a perfected security interest in the House Account under New York law. *Esteva*, 2025 WL 2171062, at *5. The parties agree, and the Eleventh Circuit held, that New York law governs interpretation of the CRA (though Florida law governs the account itself). *Id.* at *9. The Eleventh Circuit reversed summary judgment on the lien claims, holding that the words “you” and “obligations” are ambiguous, that whether Denise granted a lien or accepted joint-and-several liability for Lorenzo’s Notes turns on that ambiguity, and that under New York law the meaning of an ambiguous term is “an issue of fact” that cannot be resolved as a matter of law. *Id.* at *11–12.

4. At her deposition, Denise testified that she did not understand the security-interest provision (“Do you have an understanding of what that provision means? A No.”), did not understand the joint-and-several clause (“I don’t understand that.”), did not understand who “you” referred to when she signed, and did not understand the provisions when she signed the agreement. (Otero Dep. 26:10–23, 30:11–13, 31:8–14, 32:6–21 (App. pp. 0084, 0088–0090).) She understood the funds Lorenzo received as a “bonus … for bringing his clients to the bank,” not a loan. (Otero Dep. 33:4–14 (App. p. 0091).) UBS has retained a securities-industry custom-and-practice expert (Grumke) to opine on transition loans, security interests in advisor accounts, and joint-and-several liability.

5. Because the Eleventh Circuit’s remand left UBS’s lien claim unresolved, UBS is left pressing its fraudulent-transfer theory - that Lorenzo fraudulently placed the proceeds of Lorenzo’s Notes beyond UBS’s reach — by depositing them at UBS. The theory refutes itself: the same four deposits cannot both enhance UBS’s collateral and fraudulently place assets beyond its reach.

6. The advances did not deplete the assets available to creditors; they were offset dollar-for-dollar by receivables UBS owed Lorenzo. In connection with each of Lorenzo's Notes, UBSFS entered into a transition payment award agreement (collectively, the "TPAAs") obligating it to pay Lorenzo scheduled transition payments, and opening and maintaining a UBS Resource Management Account was a condition of those payments. (Pls.' SMF ¶ 21.) For each advance under Lorenzo's Notes, Lorenzo received a corresponding receivable from UBSFS under the TPAAs equal to or greater than the advance. (Pls.' SMF ¶ 47.) The scheduled transition payments under each TPAA equal or exceed the scheduled payments due under the corresponding Note. (Pls.' SMF ¶ 23.)

7. At the time of each 2016 deposit of the proceeds of Lorenzo's Notes, Lorenzo was employed by UBSFS, and each advance was matched by a scheduled transition payment obligation of equal or greater value. (Pls.' SMF ¶¶ 46-47.) Lorenzo was the only wage earner of a family of five. (Pls.' SMF ¶ 45.)

8. The House Account was opened on or about December 1, 2015, titled "Joint Ten W/Rights Surv." (Pls.' SMF ¶ 10.) Lorenzo and Denise signed the account documents in haste so that Lorenzo could resume trading his investments; as Lorenzo testified, "I just told whoever, I need to open an account for my wife and myself, and they gave me the documents and we signed them. We were in a hurry." (Pls.' SMF ¶¶ 6-7.) Lorenzo did not read the CRA before signing, Denise does not recall reviewing it, and UBS concedes that neither Plaintiff read it. (Pls.' SMF ¶¶ 8-9.) The signature pages contain no express disclaimer of tenancy by the entireties. (Pls.' SMF ¶ 11.) The account was funded in part with $500,000 that Lorenzo and Denise had previously held at Merrill Lynch. (Pls.' SMF ¶ 13.)

9. Lorenzo alone executed Lorenzo's Notes; Denise did not sign, guarantee, or otherwise become obligated on any of them. (Pls.' SMF ¶¶ 15, 20.) The CRA's granting language reaches only indebtedness "under this or any other agreement between you and any UBS Entity," and the CRA defines "you," "your," and "yours" as "you as a client of UBS." (Pls.' SMF ¶ 29.) The Post-Remand Record Shows - Denise knew nothing of the BTCG Loan program, the BTCG Loans, the BTCG Notes, or the BTCG TPA Agreements

10. UBS prepared and filed Lorenzo's Form U-5, certifying "the accuracy and completeness of the information contained in and with this form." (Form U-5, App. p. 0049.) The U-5 alleges that Lorenzo provided a client "with documents containing false account information" and "improperly journaled money between unrelated client accounts." (Form U-5, App. p. 0051.) It states no time period for either allegation. (Form U-5, App. p. 0051; Pls.' SMF ¶ 33.)

11. Lorenzo testified that he prepared simplified account summaries for a single client who did not understand the Merrill Lynch or the UBS statements, and that he "tried to make everything as simple as possible." (Esteva Dep. Vol. 1 29:5–19 (App. p. 0462).) He testified that he was not in charge of transfers between client accounts, which were handled by UBS's Transfer Department, and has sworn that he had no access to the internal UBS systems used to execute or record such transfers. (Esteva Dep. Vol. 1 135:16–136:11 (App. p. 0489); Esteva Sworn Statement ¶¶ 4-6 (App. pp. 0652–0653).) (Resp. to UBS SMF ¶ 29.)

12. UBS has taken inconsistent positions on the very claims at issue — positions that may give rise to judicial estoppel. UBS filed a joint secured proof of claim (Claim No. 5) identifying UBSFS and UBSCC as "Secured creditors," stating that

$2,034,662.28 of the claim is secured and that $0.00 is unsecured. (Pls.' SMF ¶¶ 36-37, 42.) UBS did not originally assert the constructive-fraudulent-transfer claims as its own; it obtained only derivative standing under 11 U.S.C. § 544(b)(1) to pursue avoidance on behalf of the estate, having admitted that the avoidance power is vested in the debtor-in-possession. (Pls.' SMF ¶¶ 43, 48, 51.) Although UBS now labels those same claims "its" counterclaims, it continues to acknowledge that it proceeds under § 544(b)(1) and that any recovery "shall inure to the benefit of the Bankruptcy Estate." (Pls.' SMF ¶¶ 53-54.)

13. The Eleventh Circuit affirmed the dismissal of UBS's actual-intent fraudulent-transfer and setoff counterclaims. Esteva, 2025 WL 2171062. Following remand, the Court authorized cross-motions for summary judgment "based on the outcome of discovery completed following the remand." (Adv. Proc. No. 19-01047, DE 176 at 2.) (Pls.' SMF ¶¶ 56-57.)

## LEGAL STANDARD

Summary judgment must be granted when there is no genuine dispute regarding a material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. In ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Judgment is required against a party who, after having sufficient time for discovery, is unable to prove an essential element of a claim for which it carries the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Here, two completed discovery periods have closed, so any failure of proof is now dispositive and cannot be excused by the need for further discovery.

## SUMMARY OF ARGUMENT

On the completed post-remand record, Plaintiffs are entitled to judgment as a matter of law. On the undisputed facts - most of them established by UBS's own documents - the 2016 deposits of loan proceeds into the Estevas' House Account were not constructively fraudulent transfers under Florida law, and the House Account is exempt tenancy-by-the-entireties property beyond the reach of UBS's claim against Lorenzo individually. Two of UBS's counterclaims are already gone: the Eleventh Circuit affirmed the dismissal of UBS's actual-intent fraudulent-transfer and setoff theories. Esteva, 2025 WL 2171062, at *14, *19. What remains fails as a matter of law. Because the entry of judgment for Plaintiffs resolves the same issues UBS raises in DE 177, the Court should grant Plaintiffs' cross-motion and deny UBS's motion. Plaintiffs organize the following Argument in three parts. Argument One sets out the legal principles that control disposition of UBS's lien claim: the tenancy-by-the-entireties presumption protecting the House Account, UBS's burden to prove a valid security interest, and the law-of-the-case effect of the completed post-remand record. Argument Two shows that the CRA's ambiguous lien language did not give Denise adequate notice of any claim against her interest in the House Account. Argument Three shows that UBS's remaining fraudulent-transfer theories fail on this record as a matter of law.

## ARGUMENT ONE
## LEGAL PRINCIPLES APPLICABLE

Three legal principles independently foreclose UBS's asserted security interest in the House Account: Florida's tenancy-by-the-entireties presumption, UBS's burden to prove a valid lien, and the law-of-the-case effect of the completed post-remand record.

**A. <u>Tenancy by the Entireties Exemption and Affect on UBS's Lien</u>**. Florida presumes that a jointly held marital bank account is owned as a tenancy by the entireties, and a creditor bears the burden of affirmatively rebutting that presumption. Beal Bank, SSB v. Almand & Assocs., 780 So. 2d 45 (Fla. 2001). Entireties property is not reachable to satisfy the individual debt of one spouse. Havoco of Am., Ltd. v. Hill, 197 F.3d 1135 (11th Cir. 1999); Esteva, 2025 WL 2171062. Lorenzo and Denise executed the House Account signature cards simultaneously, and those pages contain no express disclaimer of the entireties estate. (Pls.' SMF ¶¶ 10-11.) Although the account was titled "Joint Ten W/Rights Surv." — a default brokerage designation — that label does not constitute the clear and convincing evidence of intent to disclaim the entireties estate required under Florida law; the Florida Supreme Court in Beal Bank held that the presumption of entireties ownership applies whenever spouses acquire property jointly, and it may be overcome only by evidence that both spouses expressly agreed to hold the property in a different form. (Pls.' SMF ¶ 10.)

The account was opened in haste as a married couple's joint account — "I need to open an account for my wife and myself" — and was funded in part with $500,000 the couple had previously held at Merrill Lynch, confirming the marital character of the account. (Pls.' SMF ¶¶ 6-7, 13.)

Denise's lack of knowledge is dispositive and undisputed. She neither signed nor guaranteed any of Lorenzo's Notes. (Pls.' SMF ¶ 20; Resp. to UBS SMF ¶ 51.) She does not recall reviewing the CRA before signing; she did not know that her husband had signed or would sign any of Lorenzo's Notes; and she never understood or agreed that the joint account would serve as security for — or could be taken to pay — his separate obligations

to UBS. (Sworn Statement of Denise Otero ¶¶ 2-4 (App. pp. 0649–0650); Pls.' SMF ¶¶ 26, 28.) A spouse cannot waive the entireties estate through a note she never signed, securing a debt she never knew existed, under an agreement she never read.

On this record, there is no evidence — let alone the clear and convincing evidence Florida requires — that Denise agreed to hold the account in any form other than by the entireties. Nor does the CRA reach Lorenzo's separate debts: its granting language extends only to indebtedness "under this or any other agreement between you and any UBS Entity," and it defines "you," "your," and "yours" as "you as a client of UBS" — not as a guarantor of a spouse's promissory notes. (Pls.' SMF ¶ 29.) On the completed record, Plaintiffs are entitled to judgment that the House Account is exempt entireties property, held beyond the reach of UBS's claim against Lorenzo alone.

**B. <u>UBS's Burden of Proof</u>.** A creditor asserting a secured claim bears the burden of proving the validity, extent, and enforceability of its security interest. *In re Tuscany Energy, LLC*, 581 B.R. 681 (Bankr. S.D. Fla. 2018). The absence of an element is UBS's failure of proof, not an affirmative defense Plaintiffs must plead. *In re Ash Handkerchief Corp.*, 191 B.R. 588 (Bankr. S.D.N.Y. 1996); *see* N.Y. U.C.C. Law § 9-203 (McKinney) (requiring that value be given, that the debtor have rights in the collateral, and that "the debtor . . . [have] authenticated a security agreement that provides a description of the collateral").

No security interest attaches unless value has been given, the debtor has rights in the collateral, and the debtor has agreed to grant a security interest in described collateral. A valid grant thus requires that the operative agreement objectively and unambiguously describe the obligations secured; where, as here, the operative terms have been found

ambiguous, even a party who read the agreement before signing could not have derived unambiguous notice that her interest in a joint account was being pledged to secure the obligations under Lorenzo's Notes. For the House Account funds, UBS must therefore prove that Denise knowingly agreed to grant a lien on her interest in the account to secure the obligations under Lorenzo's Notes. Where a creditor cannot show that the owner of the property understood and agreed to the pledge, it fails to establish a prima facie case for a valid security interest. That is the precise question the Eleventh Circuit left open: whether Denise — who never signed Lorenzo's Notes — nonetheless granted UBS a lien on the entireties account, or accepted joint-and-several liability for the debt under Lorenzo's Notes. *Esteva*, 2025 WL 2171062, at *10, *12. UBS owns that question as a matter of proof.

**C. Post-Remand Record Fills The Evidential Gaps the Eleventh Circuit Identified and Ready For Full Adjudication.** The Eleventh Circuit's holding that the CRA lien language is ambiguous is a legal conclusion that Plaintiffs accept - indeed, it is the foundation for contra proferentem. What the Eleventh Circuit held could not be resolved on the prior record was the factual question of what the ambiguous terms mean - whether Denise granted a lien or accepted joint-and-several liability for Lorenzo's Notes - and those factual questions were rendered "on the record then before it." *Esteva*, 2025 WL 2171062. The Eleventh Circuit reversed and remanded, and this Court then authorized cross-motions for summary judgment "based on the outcome of discovery completed following the remand." (Esteva v. UBS Financial Services Order at 2.) Law of the case does not bar entry of judgment on that completed record. In this Circuit, the doctrine "does not apply to bar reconsideration of an issue when . . . a subsequent [proceeding] produces

substantially different evidence." *United States v. Robinson*, 690 F.2d 869 (11th Cir. 1982). The doctrine likewise does not bind a court where the prior decision rested on a materially different evidentiary record. *Alphamed, Inc. v. B. Braun Med., Inc.*, 367 F.3d 1280 (11th Cir. 2004).

The post-remand record — including the completed 2026 depositions of Lorenzo and Denise, expert discovery, and the detailed TPAA-offset evidence establishing that each advance was matched by a receivable of equal or greater value (Pls.' SMF ¶ 47), together with UBS's own dated regulatory filings — is exactly the "substantially different evidence" the exception contemplates, and it resolves in Plaintiffs' favor the very questions the Eleventh Circuit left open. Law of the case is therefore no obstacle to the relief Plaintiffs seek; if anything, it confirms that the issues are open for decision on the new record.

## ARGUMENT TWO
## THE CRA's AMBIGUOUS LANGUAGE DOES NOT AFFORD ADEQUATE NOTICE TO DENISE OF UBS' LIEN

UBS's lien claim also fails because the CRA's operative language was too ambiguous to give Denise adequate notice that her interest in the House Account could secure the obligations under Lorenzo's Notes. Denise had no independent knowledge of UBS's BTCG Loan program or of Lorenzo's Notes, and the chronology of events confirms that UBS's lien theory was an after-the-fact construct.

**A. Ambiguous Notice Is Not Adequate Notice.** Where a contract provision is ambiguous, parol evidence is admissible to determine what the parties intended the terms to mean. *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23 (2d Cir. 1988); *In re Celsius Network LLC*, 649 B.R. 87 (Bankr. S.D.N.Y. 2023). But the rules of evidence limit admissible extrinsic evidence to objective, communicated manifestations of intent.

"Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none," and "statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296 (S.D.N.Y. 1997); *Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369 (S.D.N.Y. 2006) (admissible extrinsic evidence is principally the parties' objective course of dealing and performance).

**B. UBS Cannot Fill The Evidentiary Gap With Its Industry-Custom Expert, Because Opinions On Contract Meaning And Legal Effect Are Inadmissible.** UBS's expert cannot supply what the fact record lacks. Under Federal Rule of Evidence 704, an expert may opine on an ultimate issue of fact, but "may not testify to the legal implications of conduct; the court must be the jury's only source of law," and contract interpretation is a question of law for the court. The Eleventh Circuit has squarely applied this to reject expert opinion on the meaning of a contract. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537 (11th Cir. 1990). Critically for UBS's custom-and-practice expert, testimony framed as industry custom does not escape the bar: in *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114 (11th Cir. 2018), the court held that opinions on ownership and rights under the parties' arrangement — including that it was "common in the industry that the owner of the name is the person" who created it — were "expert opinion in the form of legal conclusions" and were properly struck. Contract-interpretation testimony was allowed in only through a fact witness, not an expert. *Id.*

The point is even sharper in the lien context. In *FNB Bank v. Park Nat'l Corp.*, 996 F. Supp. 2d 1187 (S.D. Ala. 2014), applying the Eleventh Circuit rule, the court excluded expert opinion that conduct "did or did not breach the participation agreement" and that

the loan agreement "required" a party to bear certain costs, as impermissible recasting of a party's contract interpretation — and separately excluded an opinion on "the effect of a lien upon title" as a legal conclusion. And courts "regularly exclude expert opinions that opine on the interpretation of written contracts," even when offered only to show that a term is ambiguous, "because the ultimate interpretation question is the same." *Herman v. Seaworld Parks & Ent., Inc.*, 320 F.R.D. 271 (M.D. Fla. 2017). Grumke thus cannot testify that Denise granted a security interest, that "you" or "obligations" includes her, or that depositing the proceeds into a joint account did or did not affect UBS's lien. Those are the very legal conclusions reserved to the court. UBS is left to prove meaning from the admissible fact record — which, per the ambiguity analysis above, is thin.

**C. After UBS' Post-Remand-Second-Discovery-Effort Came A Cropper — The Residual Ambiguity Must Be Construed Against It — The Drafter.** New York applies an ordered process: determine ambiguity; look to extrinsic evidence to determine intent; and "if, and only if, the extrinsic evidence does not provide the answer," invoke the tiebreaker of *contra proferentem* — construing the contract against the drafter. *Celsius*, 649 B.R. at 87. When an ambiguous instrument cannot be resolved by extrinsic evidence, New York courts "construe the ambiguity against [the] … drafter of the agreement." *Finch v. Haynes*, 104 A.D.3d 1113, 962 N.Y.S.2d 495 (2013). The burden mechanics track this: once a contract is ambiguous, the burden shifts to the drafter to prove its interpretation; in the absence of extrinsic evidence, it shifts at the summary-judgment stage, and where extrinsic evidence is available but inconclusive, at trial. *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270 (2d Cir. 2000). There is no New York rule denying a sophisticated party the benefit of contra proferentem, and it applies with full force to a

standard form the counterparty did not negotiate. *Id.* Denise signed a pre-printed UBS form; UBS drafted every word. *Esteva*, 2025 WL 2171062, at *4. If UBS cannot produce conclusive, admissible objective evidence that Denise agreed to secure Lorenzo's Notes, the tie is broken against UBS, and its lien claim fails.

The qualification is important. Contra proferentem "may only be applied as a last resort, if the extrinsic evidence is inconclusive." *Perella Weinberg Partners LLC v. Kramer*, 153 A.D.3d 443, 58 N.Y.S.3d 384 (2017). And where inconclusive extrinsic evidence has been introduced, the rule "does not automatically apply" against the drafter at summary judgment; if the extrinsic evidence "raises a question of credibility or presents a choice among reasonable inferences," the meaning is a fact question for trial. *Hobish v. AXA Equitable Life Ins. Co.*, 43 N.Y.3d 442, 264 N.E.3d 223 (2025); *Morgan Stanley Grp.*, 225 F.3d at 270. That is consistent with the Eleventh Circuit's remand: the court sent the meaning of these terms to trial as "an issue of fact." *Esteva*, 2025 WL 2171062, at *12. So the cleanest version of the argument — "ambiguous form, construed against the drafter as a matter of law" — is fully available on this record, because the completed post-remand discovery has produced no admissible objective evidence that Denise agreed to secure Lorenzo's Notes. Three points sustain that conclusion: Grumke's interpretive opinions are inadmissible, both sides' subjective-understanding testimony is immaterial, and UBS has no admissible objective evidence that Denise granted a lien securing Lorenzo's Notes. On that record, UBS cannot carry its burden, and the ambiguity resolves against it.

D. The Post-Remand Record Shows — That Denise Knew Nothing Of The BTCG Loan Program, The BTCG Loans, The BTCG Notes, Or The BTCG TPA Agreements. UBS advanced Lorenzo roughly $2 million through four promissory notes under its BTCG

Loan program; only Lorenzo signed Lorenzo's Notes, and Denise did not sign, guarantee, or become obligated on any of them. (Pls.' SMF ¶ 20; Resp. to UBS SMF ¶ 51.) Denise had no independent knowledge of the program or Lorenzo's Notes: she does not recall reviewing the CRA before signing it, she did not know that Lorenzo had signed or would sign any of Lorenzo's Notes, and she never understood or agreed that the joint House Account would serve as security for — or could be taken to pay — his separate obligations to UBS. (Sworn Statement of Denise Otero ¶¶ 2-4 (App. pp. 0649–0650); Pls.' SMF ¶¶ 26, 28.) At her deposition, Denise testified that she did not understand the security-interest provision ("Do you have an understanding of what that provision means? A No."), did not understand the joint-and-several clause ("I don't understand that."), and did not understand who "you" referred to when she signed. (Otero Dep. 26:10–23, 30:11–13, 31:8–14 (App. pp. 0084, 0088–0089).) She understood the funds Lorenzo received as a "bonus … for bringing his clients to the bank," not a loan. (Otero Dep. 33:4–14 (App. p. 0091).) Notice of an ambiguous lien provision, buried in a standard-form document Denise never read, cannot be notice of a program and a set of promissory notes she did not know existed.

**D. <u>The Chronological Eulogy Of A Failed Lien</u>.** The chronology confirms that UBS's lien theory arrived only after the fact. Denise signed the CRA on December 1, 2015; Lorenzo signed the first of Lorenzo's Notes a week later, on December 8, 2015. UBS's lien theory has failed for want of proof. Bankruptcy Judge Isicoff (ret.), addressing UBS's argument, found it "a textbook illustration of a circular argument" — UBS was "trying after the fact to create a lien that did not exist, a gotcha lien, in order to recover some of the losses it has incurred." She found it "inconceivable that Ms. Otero would have just signed a general grant of a lien on half a million dollars that had nothing to do with the

promissory notes," and — because Lorenzo's Notes themselves already granted UBS a security interest in any account — found the CRA "at best … ambiguous." Oral Ruling on Mot. for Summ. J., Adv. ECF No. 28 (June 10, 2020). As a matter of law, ambiguous notice cannot supply unambiguous notice: adequate notice must mean more than inadequate notice. The Eleventh Circuit's remand confirms the same point — the panel found the CRA's ambiguity so pervasive that it required a trial to resolve, notwithstanding Judge Isicoff's own finding that the CRA was "at best" ambiguous. UBS has not disclosed who within UBS drafted this form, when this particular version was drafted, or how many versions came before or since. A lien theory that depends on notice this equivocal does not survive summary judgment — it does not survive scrutiny at all.

**ARGUMENT THREE**
**UBS' FRAUDULENT TRANSFER CLAIMS — DOGS THAT DON'T HUNT**

UBS's fraudulent-transfer counterclaims independently fail. Chapter 726 is an equitable statute that UBS, having built the very structure and directed the very deposits it now attacks, cannot invoke. UBS is judicially estopped from characterizing as fraudulent the same deposits it represented, for years, were its fully secured collateral. The 2016 deposits into the parties' joint marital account were not fraudulent transfers as a matter of Florida law. And UBS cannot establish, as a matter of law, that Lorenzo reasonably should have known in 2016 that he could not repay.

**A. Chapter 726 Fraudulent Transfer Statute — An Equitible Descendant of the Equitable Statute of 13 Elizabeth.** UBS's constructive-fraudulent-transfer counterclaim seeks an equitable remedy. The modern law of fraudulent transfers "had its origin in the Statute of 13 Elizabeth, which invalidated 'covinous and fraudulent' transfers

designed 'to delay, hinder or defraud creditors and others.'" *BFP v. Resol. Tr. Corp.*, 511 U.S. 531 (1994). Florida's statute has long been "basically a restatement of the law on fraudulent conveyances as declared by the Statute of Elizabeth," *In re Miami Gen. Hosp., Inc.*, 124 B.R. 383 (Bankr. S.D. Fla. 1991), and its predecessor statutes are "merely restatements or adoption of the statute 13th Elizabeth." *George E. Sebring Co. v. O'Rourke*, 101 Fla. 885, 134 So. 556 (1931). *See Gibson v. Love*, 4 Fla. 217 (1851) (applying the Statute of 13 Elizabeth in 1851). Because "fraud" is among "the recognized subjects and most ancient foundation for equity jurisdiction," a creditor challenging a transfer must "resort to a court of equity." *Sebring*, 134 So. at 556. The Eleventh Circuit holds that "an action by a creditor or trustee-in-bankruptcy to set aside a fraudulent conveyance is an equitable action." *In re Graham*, 747 F.2d 1383 (11th Cir. 1984). The remedy — "[t]he avoidance or setting aside of a fraudulent conveyance" — "is a creditor's remedy sought in equity." 37 Am. Jur. 2d Fraudulent Conveyances and Transfers  125; *accord PCS Nitrogen, Inc. v. Ross Dev. Corp.*, No. 2:09-3171, 2010 WL 3893619 (D.S.C. Sept. 30, 2010) (persuasive). And when Florida enacted Chapter 726, it "substantially incorporated the legal and equitable principles of the predecessor act into the present act," *Advest, Inc. v. Rader*, 743 F. Supp. 851 (S.D. Fla. 1990), with § 726.111 preserving the principles of law and equity as a supplement to the statute unless expressly displaced. *Id.*

UBS cannot escape equity by recasting its claim as one at law. The Supreme Court held in *Granfinanciera* only that a suit "to recover an alleged fraudulent conveyance of a determinate sum of money" is legal, while describing "the traditional equitable remedy of setting aside a conveyance." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). Courts in this District read that decision as confined to money-judgment requests: where a

claimant "seeks return of the actual item transferred or the voiding of an instrument," "such actions are brought in equity." *In re D.I.T., Inc.*, 575 B.R. 534 (Bankr. S.D. Fla. 2017). UBS does not seek a bare money judgment; it seeks to unwind Lorenzo's 2016 deposits and reach the House Account itself — the avoidance and recovery of specific property that lies on the equitable side of that line. Equitable principles therefore govern UBS's counterclaim.

**B. Equity Rewards Not the Architect-In-Chief Of The Fraudulent Transfers.** A party invoking equity must come with clean hands. A litigant may be "denied affirmative equitable relief" where "his conduct has been inequitable, unfair, dishonest, fraudulent or deceitful as to the controversy in issue"; equity refuses to enforce a claim that is "itself inequitable, unconscionable or tainted." *Villas of Lake Jackson, Ltd. v. Leon Cnty.*, 884 F. Supp. 1544 (N.D. Fla. 1995). The bar applies where the misconduct is "connected with the matter in litigation," including where "the plaintiff and defendant are both parties to a [challenged] transaction." *Faber v. Landman*, 123 So. 2d 405 (Fla. Dist. Ct. App. 1960).

These principles have specific force here: "Estoppel can be a defense to a fraudulent transfer action under Florida law" under § 726.111, and a party that "caused [an entity] to enter into the transactions it now challenges as fraudulent transfers" cannot equitably "recover on the very transaction it initiated." *In re Brit. Am. Ins. Co.*, No. 09-31881-EPK, 2013 WL 211314 (Bankr. S.D. Fla. Jan. 18, 2013). A fraudulent transfer is "not void, but voidable," so "creditors who are participants in an alleged fraudulent transfer, or who have ratified it, cannot then seek to have that transfer avoided." *First State Bank of Nw. Ark. v. McClelland Qualified Pers. Residence Tr.*, No. 5:14-CV-130 (MTT), 2015 WL 5595566

(M.D. Ga. Sept. 21, 2015). The Eleventh Circuit, applying Florida law, likewise treats a creditor's own participation as decisive. *Mission Bay Campland, Inc. v. Sumner Fin. Corp.*, 731 F.2d 768 (11th Cir. 1984).

UBS set up the advance-commission structure and directed the very transfers it now attacks. UBS advanced a portion of Lorenzo's anticipated future commissions through Lorenzo's Notes and companion transition-payment award agreements, and — as a condition of those payments — required Lorenzo to open and maintain a UBS Resource Management Account and to authorize UBSFS to deposit the transition payments into it; Lorenzo in turn deposited the proceeds of Lorenzo's Notes into the House Account he maintained at UBS. (Pls.' SMF ¶¶ 10, 21-22.) UBS then claimed a security interest in that same account and, for nearly a decade, insisted the deposits were its collateral, filing a proof of claim asserting a fully secured claim on the account. (Pls.' SMF ¶¶ 36-37, 42.) Having designed the structure and directed the deposits, UBS cannot turn to an equity-based statute to brand those same deposits fraudulent. That UBS proceeds derivatively under § 544(b)(1) does not cleanse its hands: as this Court recognized in In re Brit. Am. Ins. Co., the equitable defenses preserved by  726.111 - including estoppel, unclean hands, and creditor participation - run against the claim itself, not merely against the party asserting it. 2013 WL 211314. UBS — the creditor that built the transaction and seeks the recovery — is the sole real party in interest that asks this Court for equitable relief. Nor is the point answered by the rule that in pari delicto does not lie against a statutory fraudulent-transfer avoidance claim, see In re Skyway Commc'ns Holding Corp., 389 B.R. 801 (Bankr. M.D. Fla. 2008); Plaintiffs press not in pari delicto but estoppel, unclean hands, and creditor participation — defenses Florida expressly preserves against a Chapter 726

claim through § 726.111. Brit. Am. Ins., 2013 WL 211314. On this record, UBS's own conduct bars the equitable relief it seeks.

UBS obtained derivative standing as a secured creditor on that basis. Having taken the benefit of a fully secured lien on the account, UBS cannot now brand the deposits that funded it fraudulent. A fully secured creditor suffers no injury from the transfers it now attacks.

UBS's own filings confirm the inconsistency - a litigating posture squarely at odds with the estate standing it sought. Seeking leave to bring the fraudulent-transfer counterclaims, UBS admitted that the avoidance power under § 544(b)(1) "is a power vested in the trustee or debtor-in-possession" - here, Lorenzo. (Pls.' SMF ¶¶ 43, 48.) On June 12, 2020, the Court granted UBS only derivative standing "on behalf of the debtor-in-possession," with any recovery inuring to the estate. (Pls.' SMF ¶¶ 51, 54.)

UBS now calls those estate claims "its" counterclaims and seeks to recover on them for itself, while still conceding it proceeds only under § 544(b)(1). It cannot have it both ways. Section 544(b)(1) reaches only transfers "voidable under applicable law by a creditor holding an unsecured claim that is allowable" - a power a creditor claiming $0.00 unsecured cannot invoke.

Because UBS successfully persuaded the Court to accept its earlier positions, judicial estoppel bars its clearly inconsistent litigating posture now, and the Court should enter judgment for Plaintiffs on this ground as well.

**C. <u>Subjective Speculation That Lorenzo Foresaw His Termination, At Best, Is An Improbable Inference, Not Evidence</u>.** A constructive fraudulent transfer under Florida law requires, as relevant here, that the debtor reasonably should have

believed he would incur debts beyond his ability to pay, or that he was insolvent at the time of or rendered insolvent by the transfer. Fla. Stat. Ann. §§ 726.105(1)(b), 726.106(1) (West) (pre-2020 amendment). UBS bears the burden on that element, and its own dated documents defeat it as a matter of law. The 2016 deposits were also made in exchange for reasonably equivalent value, for the reasons shown in Argument Three, Section D above, defeating the threshold requirement of both §§ 726.105(1)(b) and 726.106(1) on an independent ground.

The affirmative record forecloses any inference of insolvency or of a reasonable belief that Lorenzo could not repay. At the time of each 2016 deposit, Lorenzo was employed by UBSFS, and each advance was matched by a scheduled transition payment obligation of equal or greater value — $2,439,388.18 in scheduled transition payments against $2,219,990.10 in aggregate Note principal. (Pls.' SMF ¶¶ 46-47.) A fully employed advisor whose loans were to be repaid out of the very commissions the lender owed him neither was insolvent nor reasonably should have believed he could not repay. (Pls.' SMF ¶¶ 45-47.)

The deposits UBS attacks were made in 2016. Esteva, 2025 WL 2171062. The only UBS-era conduct UBS ever documented — the journaling of funds between client accounts — occurred, by UBS's own regulatory records, "between at least January and March 2017," months after the transfers. (Form U-5, App. p. 0051; FINRA AWC at 2, App. p. 0055.) Conduct that had not yet occurred when Lorenzo made the transfers cannot establish that, at the time of the transfers, he knew or should have known he could not repay. (Pls.' SMF ¶¶ 16-19, 33; Resp. to UBS SMF ¶ 29.) The balance of UBS's narrative — the "false account information" allegation traced in the AWC to statements "from 2001 to 2017" —

overwhelmingly concerns the period before Lorenzo joined UBS: he entered the securities industry in 1991 and did not register with UBS until November 17, 2015, and UBS's own motion concedes the conduct "began … when he was registered with Merrill." (FINRA AWC at 1-2, App. pp. 0054–0055; Adv. Proc. No. 19-01047, DE 177 at 7.)

To the extent the date range extends into the UBS period, Lorenzo testified that he prepared simplified account summaries for a single client who could not understand the brokerage statements - not that he engaged in conduct he believed would lead to termination or impair his ability to repay. (Esteva Dep. Vol. 1 29:5–19 (App. p. 0462).) UBS itself was unaware of the conduct in 2016 and continued to advance funds under the TPAAs. Conduct that allegedly went undetected for years - including by the very lender making the advances - cannot show that Lorenzo anticipated imminent exposure in 2016; it shows the opposite — that, as of 2016, there was no objective basis for Lorenzo to believe the conduct would be discovered or that it would impair his ability to continue earning commissions and repaying Lorenzo's Notes. Because the element on which UBS's counterclaim depends is refuted by UBS's own dated documents, Plaintiffs are entitled to judgment.

**CONCLUSION**

For eight years now UBS has pressed two claims that cannot both be true. Its lien claim fails because the House Account is exempt tenancy-by-the-entireties property and the CRA's ambiguous language gave Denise no notice that she had pledged it; its fraudulent-transfer counterclaims fail for the seven independent reasons set out above. But the deepest flaw is structural: the two theories cannot coexist.

UBS lien theory is so flimsy it collapses under its own weight - the fiction that a sophisticated, world-class financial-services firm would consciously bury its security interest in a generic account form instead of using the tried-and-true guaranty and account-pledge agreements it deploys every day. That premise is not merely improbable; it is preposterous, and it leaves UBS impaled on the horns of its own dilemma. If back-dooring the lien truly was UBS's plan, then it is not the shrewd market-shaper it holds itself out to be. And if it was not UBS's plan, then UBS has manufactured an intent it never had, chasing an undeserved windfall on the backs of a family it froze out. There is no third option. Worse for UBS, the harder it sells the lien theory, the more absurd its fraudulent-transfer theory becomes - and the reverse is equally true.

The two theories do not merely sit in tension — they annihilate each other, and UBS's decision to press both at once is facially absurd. UBS cannot brand the very same deposits as collateral it always meant to hold and as assets Lorenzo schemed to hide. One deposit cannot be both the prize UBS locked down and the loot Lorenzo spirited away. That self-contradiction chains UBS to a zero-sum proof conundrum of its own making: every fact that props up the lien knocks out the transfer claims, and every fact that props up the transfer claims dynamites the lien. UBS cannot win on both, cannot honestly believe in both, and cannot be permitted to whipsaw this Court and the Estevas by advancing both. That is the textbook "fast and loose" gamesmanship judicial estoppel exists to stamp out. *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010).

This conundrum is no accident of pleading - it is the direct product of UBS reverse-engineering its claims to fit the account it seized, throwing every theory at the wall to see

what sticks. And UBS has nowhere to hide. It is the lone creditor branding these deposits fraudulent, and its 544(b)(1) recovery would inure to no innocent unsecured creditor whose independent claim could survive. The inconsistency belongs to UBS and UBS alone. It is fatal to the very claim UBS built, and the Court should end this eight-year charade by entering judgment for the Estevas.

Respectfully submitted on September 4, 2026.

AM LAW
Counsel for Lorenzo Esteva
7385 SW 87th Avenue, Suite 100
Miami, FL 33173
Telephone: (305) 441-9530
Email: gmm@amlaw-miami.com
By: /***s/ Gary M. Murphree***
Gary M. Murphree, Esq.
Florida Bar No. 996475

\
DANIEL FOODMAN, ESQ.
Counsel for Denise Otero Vilarino
The Foodman Firm, P.A.
550 Biltmore Way Suite 1250
Coral Gables, FL 33134
Office: 305-201-3663
Fax: 305-675-8188Telephone: (305) 403-8788
Email: DF@FoodmanFirm.com
Daniel Foodman, Esq.
Florida Bar No. 337160

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 4, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered to receive electronic notice in this adversary proceeding.

By: ***/s/ Gary M. Murphree***
Gary M. Murphree, Esq.